NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO D.T.

No. 1 CA-JV 25-0209

FILED 06-23-2026

---

Appeal from the Superior Court in Maricopa County
No. JD43333
The Honorable Joan M. Sinclair, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Office of the Public Advocate, Mesa
By Seth Draper
*Counsel for Appellant Justice H.*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee DCS*

Maricopa County Office of the Legal Advocate, Phoenix
By Amanda Adams
*Counsel for Appellee D.T.*

---

**MEMORANDUM DECISION**

Judge Angela K. Paton delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Judge Jennifer M. Perkins joined.

---

**P A T O N**, Judge:

**¶1**         Justice H. ("Mother") appeals the juvenile court's order terminating her parental rights to D.T. and denying her motion to reopen evidence. Although the court also terminated D.T.'s father's parental rights, he is not a party to this appeal. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

**¶2**         We view the facts in the light most favorable to upholding the juvenile court's termination order. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 250, ¶ 20 (2000).

**¶3**         In August 2023, the Department of Child Safety ("DCS") was notified that Mother failed to pick up eight-year-old D.T. from school for the third time. Upon conducting a home visit, DCS observed a methamphetamine pipe on a counter within D.T.'s reach. Mother's boyfriend, who lived with her, was visibly intoxicated and "passed out" for forty-five minutes. He was woken up, at which time he reported that he used methamphetamine and claimed the pipe was his. Mother reported that her boyfriend took care of D.T. while she worked and that she herself used cocaine.

**¶4**         DCS took custody of D.T. that day. The next day, it petitioned the court to find him dependent based on Mother's neglect and substance abuse. The court found D.T. dependent in December 2023.

**¶5**         Over the next twenty months, Mother minimally engaged in reunification services and only sporadically communicated with DCS. DCS referred Mother to Family Connections six times, but each referral was closed out due to her lack of engagement. Mother's three referrals for supervised visitation and case aide services were also closed out because of her inconsistent engagement. Her participation in drug testing was similarly minimal. She did not test between October 2023 and March 2024, and the samples she did provide tested positive for various combinations

of fentanyl, cocaine, methamphetamine, THC, and alcohol. Two years later, in August 2025, DCS moved to terminate Mother's parental rights.

¶6            The juvenile court set a trial in November 2025. Four days before trial, DCS disclosed numerous records to Mother (the "November 13 disclosure"). On the day of trial, Mother moved for a continuance because she had not finished reviewing the new documents. DCS stated it was not seeking to admit any of the newly disclosed documents into evidence. The juvenile court denied a continuance but informed Mother that it would not issue its ruling until after December 5, 2025, and Mother had until that date to file a motion to reopen the evidence if she discovered anything relevant to her defense after reviewing the documents. But the court emphasized that it would reopen evidence only for information discovered in the November 13 disclosure and "[n]ot on anything additional that may be coming out."

¶7            At trial, the court heard testimony from Mother, Mother's substance abuse disorder counselor, the DCS case manager, and D.T.'s court-appointed special advocate ("CASA").

¶8            D.T.'s CASA testified that D.T. wished to reunify with Mother. Mother testified that she moved to California a few months ago and was now engaging in services because she had a familial support system in California, which she lacked in Arizona. Mother started a full-time job two weeks before trial and began attending an intensive substance abuse treatment program. Mother's counselor confirmed that Mother started treatment the prior month but testified that the program took six to twelve months to complete.

¶9            The case manager, however, testified that until recently, Mother had consistently failed to engage in reunification services. Mother frequently missed appointments, which she told DCS was due to her methamphetamine usage keeping her up at night. He also testified that D.T. was thriving in his foster placement, who was a family friend in California, and that his placement wanted to adopt him. He noted that D.T.'s placement had called California's child protective services due to concerns about another child in the home watching pornography, but that D.T. had not been involved.

¶10           On December 5, 2025, Mother moved to reopen evidence, requesting an additional day of trial and permission to submit additional exhibits and to add and recall witnesses. Her proposed exhibits included: (1) the case manager's case notes from October 16, 29, and 30, 2025; (2) text

messages between herself and the case manager; (3) a "unit consultation summary" documenting her participation in services; (4) a visitation note; (5) a November 7, 2025, service letter; and (6) a December 2, 2025, progress update letter from her substance use disorder counselor. Mother claimed she discovered information in these documents that conflicted with the DCS case manager's testimony, so she needed to cross-examine him further. She also pointed to a case note stating that she "ha[d] family members willing to be placement," claiming that, "[u]pon further review" of the case note, it had "come to light" that her roommate and aunt were each willing to foster D.T. So she wanted to call her aunt to testify that she was willing to foster D.T. and that DCS never contacted her about D.T.

**¶11**      DCS responded that each of the alleged inconsistencies between the information in the exhibits and the case manager's testimony were not in fact inconsistencies or related to uncontested issues. Further, Mother had access to any text messages between herself and the case manager before the November 13 disclosure. DCS also argued that the evidence she sought to introduce regarding a potential alternative foster placement for D.T. went beyond the scope of information in the disclosure. In fact, DCS asserted Mother never told DCS that she had an aunt who was willing to foster D.T.

**¶12**      The juvenile court denied Mother's motion, agreeing with DCS that the information Mother sought to introduce was merely cumulative to the testimony at trial and "nothing in the exhibits . . . warrant[ed] additional cross examination of prior witnesses."

**¶13**      The court then ruled, based on the evidence at trial, that DCS had established both chronic substance abuse and fifteen months out-of-home placement grounds for termination. The court acknowledged that Mother was now employed, participating in services, and had stable housing. But it found Mother had failed to make any of the necessary changes to her life until a month or two prior and was "unable to provide a cogent reason for why she did not make the changes . . . until shortly before the severance trial." Instead, for most of the dependency period, she "did essentially nothing to place [D.T.]'s needs ahead of her own." And because she had only started treatment a few weeks ago, it found she "ha[d] not demonstrated the ability to maintain sobriety."

**¶14**      The court concluded there was reason to believe that Mother's substance abuse would continue for a prolonged period and that she had been unable to remedy the circumstances that caused D.T.'s out-of-home placement. Further, Mother's chronic substance abuse caused her to be

unable to discharge her parental responsibilities and there was a substantial likelihood she would be unable to exercise proper parental care and control in the near future. The court also found DCS had made diligent efforts to provide reunification services to Mother. Its ruling detailed the "array" of services DCS provided, including the Family Connections program, the Nurturing Parenting Program, visitation, substance abuse testing and treatment, and psychological and psychiatric evaluations.

¶15 The court then determined that termination was in D.T.'s best interests. It found D.T. had been in his placement since December 2024, and was bonded to his placement. Further, his placement was meeting all of D.T.'s needs and wanted to adopt him. The court therefore terminated Mother's parental rights to D.T.

¶16 Mother timely appealed the court's order denying her motion to reopen evidence and terminating her parental rights. We have jurisdiction under Arizona Revised Statutes ("A.R.S.") Sections 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶17 Mother argues the juvenile court erred in denying her motions to continue trial and reopen evidence. She further contends that no reasonable evidence supported the court's findings that statutory grounds for termination existed and that termination was in D.T.'s best interests. D.T. filed an answering brief adopting Mother's arguments.

### I. The juvenile court did not abuse its discretion in denying Mother's request for a continuance and motion to reopen evidence.

¶18 Mother argues the juvenile court violated her due process rights by denying her motion to continue and her motion to reopen evidence because it prevented her from being able to cross-examine the DCS case manager about discrepancies between his testimony and case notes. She further claims that, in doing so, the juvenile court improperly excluded evidence bearing on the best interests determination.

¶19 We review alleged due process violations de novo. *Jeff D. v. Dep't of Child Safety*, 239 Ariz. 205, 207, ¶ 6 (App. 2016). But the juvenile court has broad discretion in deciding whether to grant motions to continue and motions to reopen evidence. *See Findlay v. Lewis*, 172 Ariz. 343, 346 (1992); *McCutchen v. Hill*, 147 Ariz. 401, 406-07 (1985). So we review the denial of each motion for an abuse of discretion. *In re Z.L.*, 256 Ariz. 138,

142, ¶ 15 (App. 2023); *Johnson v. Johnson*, 64 Ariz. 368, 370 (1946). And we will not reverse unless Mother demonstrates prejudice. *In re Z.L.*, 256 Ariz. at 142, ¶ 15; *Grummel v. Hollenstein*, 90 Ariz. 356, 361 (1962).

**¶20** "Due process requires that parties have an adequate opportunity to present factual and legal claims fully." *Dep't of Child Safety v. Carel G.*, 260 Ariz. 263, 270, ¶ 26 (App. 2025) (citation omitted). Further, "[a] court generally must hear any competent and potentially significant evidence that bears on the best interests of the child." *James A. v. Dep't of Child Safety*, 244 Ariz. 319, 322, ¶ 8 (App. 2018). Accordingly, the juvenile court "may continue" a termination hearing for up to 30 days "if it finds that the continuance is necessary for the full, fair, and proper presentation of evidence and the best interests of the child would not be adversely affected." Ariz. R.P. Juv. Ct. 353(b)(3). But "[m]otions to continue will be granted 'only if in the discretion of the [juvenile] court circumstances exist making delay indispensable to the interests of justice.'" *In re Termination of Parental Rts. as to H.B.*, No. 1 CA-JV 24-0198, 2025 WL 1693398, at *2, ¶ 11 (Ariz. App. June 17, 2025) (mem. decision) (quoting *State v. Ashelman*, 137 Ariz. 460, 465 (1983) (citation modified)).

**¶21** The juvenile court did not abuse its discretion in denying Mother's motion to continue and instead offering her the opportunity to move to reopen the evidence if she discovered information in the November 13 disclosure that was relevant to her defense. When Mother filed her motion to continue, she had not finished reviewing the documents, so neither Mother nor the court knew whether they contained any relevant information. Without this information, the court could not determine whether a delay was in fact necessary for Mother to fully present her case. By offering Mother the opportunity to move to reopen evidence if she discovered relevant information, the court protected both her right to due process and D.T.'s interest in not delaying the proceeding. *See Pima Cnty. Juv. Severance Action No. S-2462*, 162 Ariz. 536, 538 (App. 1989) (noting that "determinations regarding children whose best interests are at risk . . . require expedient consideration").

**¶22** Further, Mother suffered no prejudice from the court's denial of her motion to continue. The court gave her over two weeks to review the documents and file a motion to reopen before it issued its decision. She filed a motion presenting all the information she believed was relevant to her defense. The court reviewed all of her proposed exhibits and found them cumulative to the evidence at trial.

**¶23**          Likewise, the court did not abuse its discretion in denying her motion to reopen evidence. In deciding whether to reopen evidence, the court considers "whether all the evidence, offered in good faith and necessary to the ends of justice has been heard." *State v. Doody*, 187 Ariz. 363, 378 (App. 1996) (citations omitted) (internal quotation marks omitted). It does not need to reopen for evidence of little probative value. *Id.*

**¶24**          Mother does not challenge the juvenile court's findings on how her proposed exhibits were cumulative to the evidence at trial. She merely argues the court prevented her from fully cross-examining the DCS case manager on inconsistencies between his testimony and information she found in the documents. But the juvenile court found "nothing in the exhibits . . . warrant[ed] additional cross examination" of the case manager. This was not clearly erroneous.

**¶25**          Mother alleged five inconsistencies she claims warranted further cross-examination.[1] She first points to the case manager's October 16, 2025, case note, which stated that "[a] psychological evaluation has not been completed even though recommended by the Unit Psychologist." She claims this contradicts the unit psychologist's notes, which left the "psychological assessment" unchecked in a list of recommended services. DCS explained that the note meant to say "psychiatric evaluation" instead of "psychological evaluation" and the discrepancy was likely just a clerical error. Regardless, Mother knew what type of evaluation she was supposed to get. Numerous case reports consistently indicated that DCS recommended Mother complete a psychiatric evaluation and Mother herself testified she knew DCS asked her to undergo a psychiatric evaluation. She nevertheless failed to do so. The court did not abuse its discretion in finding the discrepancy was not relevant.

---

[1] DCS's answering brief correctly notes that Mother's brief does not identify what specific discrepancies she needed to cross-examine the case manager about. Mother responds that "it is impossible for [her] to explicitly articulate what would have been elicited [on cross examination] as Mother does not know what she does not know." We may consider an appellant's failure to develop an argument waiver of the issue. *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 234, ¶ 14 n.6 (App. 2011). But we decline to do so here because a child's best interests are implicated. *See Nold v. Nold*, 232 Ariz. 270, 273, ¶ 10 (App. 2013). We therefore address on the merits the inconsistencies Mother alleges in her motion to reopen evidence.

**¶26**      Mother further points out that same case note stated that Mother indicated that D.T. missed two virtual visits.  Mother claims this contradicted the case manager's testimony that she had been inconsistent with visitation.  But Mother herself admitted she did not regularly participate in visitation.  And the fact that D.T. missed two visits does not negate the fact that Mother herself missed half of all scheduled visits.  Further, D.T.'s CASA testified that D.T. had missed one or two virtual visits due to connectivity issues.

**¶27**      The October 16, 2025, case note also indicated that Mother met with the case manager that day, informed him she was participating in treatment, and gave him her counselor's contact information.  She claims this contradicted the case manager's testimony that he was unaware of her progress in services until he received a written update from her counselor in November.  But Mother provides no record citation to where in the transcript this testimony can be found, nor have we been able to locate it.  Regardless, the mere fact that Mother told the case manager she was participating in services does not mean that the case manager is aware of her progress in those services.

**¶28**      Mother next contends that the case manager's November 2025 service letter to her instructing her that it was important for her to maintain employment contradicted his testimony that she should not be focused on employment.  Again, Mother provides no record citation for this testimony and we cannot find it.  At most, the case manager testified that Mother had not yet proven an ability to balance full-time work, substance abuse treatment, and parenting responsibilities.  And he expressed concern that she had already missed several virtual visits with D.T. due to her inability to manage her work schedule.

**¶29**      Finally, Mother points to a text message she sent her case manager, requesting assistance with bus passes in California, and the November 2025 service letter, which instructed her she would need to complete weekly drug testing but did not provide testing location information.  She claims this information rebuts the case manager's assertion that DCS made reasonable efforts to provide reunification services to Mother.  It does not.  The case manager's response to her text message informed her that he would inquire into getting her bus passes.  And the service letter stated that DCS had submitted an out-of-state request to locate a testing facility close to where she lived and would inform her once it had done so.  Further, if Mother had trouble getting DCS's help with transportation or been confused about where to do the drug test, she would

have known this at the time of trial, but she never made either assertion at trial.

**¶30** Because the record supports the court's conclusion that none of the information Mother discovered in the November 13 disclosure warranted further cross-examination of the case manager, the juvenile court did not err in denying Mother's motion to reopen. *Compare Johnson*, 64 Ariz. at 369 (superior court abused its discretion in declining to reopen the case to hear testimony that "contradicted much of the testimony" at trial and implicated the best interests of the children) *with Aussie v. Hashemi*, No. 1 CA-CV 11-0253, 2012 WL 1622355, at *3, ¶ 9 (Ariz. App. May 8, 2012) (mem. decision) (superior court did not abuse its discretion in declining to reopen the case for evidence relating to alleged child abuse because it "added nothing substantive to the court's consideration of the issues"). Mother's due process rights were satisfied, and the court heard all evidence relevant to D.T.'s best interests.

## II. The juvenile court's termination order was not clearly erroneous.

**¶31** To terminate a parent-child relationship, the juvenile court must find (1) by clear and convincing evidence that at least one statutory ground for termination exists and (2) by a preponderance of the evidence that the termination is in the child's best interests. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149-50, ¶ 8 (2018); *see also* A.R.S. § 8-533(B) (listing grounds for termination). As the trier of fact, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We therefore accept the juvenile court's factual findings unless no reasonable evidence supports them and affirm a termination order unless it is clearly erroneous. *Id.*

### A. Sufficient evidence supports the juvenile court's finding of chronic substance abuse.

**¶32** To terminate parental rights on chronic substance abuse grounds, the juvenile court must find that (1) the parent had a history of chronic substance abuse, (2) the parent was unable to discharge her parental duties because of the substance abuse, and (3) there were reasonable grounds to believe the condition would continue for a prolonged, indeterminate period. *Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, 453, ¶ 12 (App. 2005); A.R.S. § 8-533(B)(3). The court must also find that DCS "made reasonable efforts to reunify the family or that such efforts would have been futile." *Jennifer G.*, 211 Ariz. at 453, ¶ 12.

¶33          Mother argues no reasonable factfinder could find she had a history of chronic substance abuse because she had only begun using substances shortly before DCS took custody of D.T.  She further argues no reasonable factfinder could find her substance abuse or inability to parent was likely to continue because she was now sober, in treatment, employed, and had housing.

¶34          In support of her argument, Mother claims she only began using "hard drugs" shortly before DCS took custody of D.T., unlike the father in *Raymond F. v. Ariz. Dep't of Econ. Sec.*, who began using drugs at age twelve.  224 Ariz. 373, 377, ¶ 17 (App. 2010).  But Mother testified that "marijuana ha[d] always been a part of [her] life[]," and that she used it to "sustain [her] depression and anxiety."  Based on her own report to a DCS substance abuse service provider, Mother had been using marijuana for over fourteen years, beginning at age seventeen, and was using it multiple times a week.  The court was also "not convinced that Mother only started using 'hard drugs' shortly before th[e] dependency case began."  Further, there is no bright-line rule as to how long a parent must have used drugs for substance abuse to be considered "chronic."  Mother's consistent inability to abstain from substances until the last two months of a nearly two-year dependency period supports the court's finding that Mother had a history of chronic substance abuse.  *See id.* at 379, ¶ 29 (father's failure to remedy substance abuse despite pending termination is evidence he has not overcome his dependence on drugs and alcohol).

¶35          Reasonable evidence also supports the court's finding that Mother's condition was likely to continue.  In considering whether a parent's substance abuse is likely to "continue for a prolonged indeterminate period," courts may consider "the length and frequency of [the] substance abuse, the types of substances abused, behaviors associated with the substance abuse, prior efforts to maintain sobriety, and prior relapses."  *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 20 (App. 2016).  And "[g]enerally, a parent's temporary abstinence from drugs and alcohol does not outweigh her significant history of abuse or her consistent inability to abstain during the case."  *Id.* at ¶ 17.

¶36          The court acknowledged that Mother was "now in a better place," but it also expressed concern that there remained "much uncertainty . . . as to Mother's battle with substance abuse," given that Mother started treatment less than two months before the hearing and "has not been able to demonstrate more than a few weeks of sobriety at best."  Indeed, Mother only stopped using marijuana less than two weeks before trial after having used it for over fourteen years.  While Mother's recent improvements are

commendable, it was within the juvenile court's discretion to find they did not outweigh her history of chronic substance abuse, and we will not reweigh the evidence. *Id.* at 286-88, ¶¶ 16-17, 25.

¶37 Sufficient evidence supports the juvenile court's finding of chronic substance abuse grounds. Because only one statutory ground is required to support a termination, we do not address Mother's arguments regarding the out-of-home placement grounds. *See Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 578, ¶ 5 (App. 2017).

## B. Sufficient evidence supports the juvenile court's finding that termination was in D.T.'s best interests.

¶38 To conclude termination is in a child's best interests, the juvenile court must find that "the child would benefit from a severance *or* be harmed by the continuation of the relationship." *Matter of Appeal in Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). "When a current placement meets the child's needs and the child's prospective adoption is otherwise legally possible and likely, a juvenile court may find that termination of parental rights, so as to permit adoption, is in the child's best interests." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3-4, ¶ 12 (2016).

¶39 The juvenile court here found that D.T. was bonded to his placement, which was meeting all of his needs and wanted to adopt him. Permitting D.T. to be adopted by a placement that was meeting his needs is a benefit to termination that is sufficient on its own to support a best interests determination. *Demetrius L.*, 239 Ariz. at 3-4, ¶ 16. But the court also found D.T. "ha[d] waited for over two years for Mother to get herself together" and that "it would be unfair for [D.T.] to wait any longer." *See id.* at ¶ 15 ("protect[ing] a child's interest in stability and security" is "of foremost concern") (citation omitted). The court acknowledged that D.T. did not want Mother's parental rights to be terminated but concluded that termination was ultimately in his best interests. *Cf.* A.R.S. § 25-403(A)(4) (child's wishes are a factor to consider, but not dispositive, in the best interests analysis for legal decision-making and parenting time).

¶40 Mother does not challenge any of these findings. Instead, she claims the juvenile court failed to consider two facts: (1) that placement wanted to move to Jamaica with D.T. against D.T.'s wishes, and (2) that placement's biological child was attempting to groom D.T. But we presume the court considered all of the evidence before making its ruling. *See Fuentes v. Fuentes*, 209 Ariz. 51, 55-56, ¶ 18 (App. 2004). And although the court must consider the totality of the circumstances in determining a child's best interests, *Alma S.*, 245 Ariz. at 150-51, ¶ 13, it need not list every fact on

which its ruling is based, *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 451-52, ¶ 19 (App. 2007).

**¶41**　　　　Further, the evidence does not support either of these assertions. The case manager testified that placement "ha[d] plans of traveling, but no plans of permanent[ly] moving . . . out of the United States," and the alleged "grooming" incident was placement's biological child watching pornography, which D.T. was not involved in. Mother claims the case manager "simply downplay[ed] the issues." She is, in essence, asking us to reweigh the evidence, which we will not do. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004) ("[T]his court will not reweigh the evidence but will look only to determine if there is evidence to sustain the [juvenile] court's ruling."). Sufficient evidence supports the juvenile court's best interests determination based on D.T.'s adoptability and need for permanency.

## CONCLUSION

**¶42**　　　　We affirm.

